STATE OF IOWA, Appellee, v. CLAIRE R. NEFF, Appellant.

No. 44865.

APRIL 2, 1940.

Fred D. Everett, Attorney General, Jens Grothe, Assistant

384

Attorney General, and George F. Mikesh, County Attorney, for appellee.

G. P. Linville and W. L. Barker, for appellant.

STIGER, J.—On January 13, 1938, defendant was operating a furniture store in Cresco, Iowa, in a building owned by A. L. Peterson. About 3 o'clock on the morning of January 14, 1938, the building in which he conducted the business was burned. All of the evidence introduced by the State was circumstantial.

■ We are first confronted with defendant's challenge to instruction No. 13 which reads:

"Evidence has been introduced by the State regarding certain tracks or footprints near the scene of the fire, and claimed by the State *to be pointing toward and away from the store building. The State claims that these tracks or footprints were made by the defendant,* but the defendant denies that they were made by him at any time.

"You are instructed that you should consider all the evidence in regard to footprints, and all the other facts and circumstances as shown by the evidence bearing on that question, and determine from it all whether the footprints were made by the defendant, bearing in mind that the burden is on the State to satisfy you by the evidence and beyond a reasonable doubt that such footprints were made by the defendant at the time claimed by the State."

Appellant objects to the italicized portion of the instruction because there is no evidence of footprints pointing *toward* the store building. In passing on the merits of this assignment of error it will be necessary to refer to some of the evidence. Don Powers, a night watchman, testified that after he discovered the fire in the basement of the building and was driving to the telephone office, which is located west of the Peterson building, to notify the telephone operator to turn in a fire alarm, he noticed a car parked in front of the Peterson building. Upon returning to the fire from the telephone office he observed that the parked car was gone. Sometime later he

went to the front of the Peterson building and noticed shoe tracks in the snow leading from the building to the place where the car had been parked. The witness thought the tracks were possibly made by a number 9 or number 10 shoe. Sheriff Pederson testified:

"I was called to the front end of the building and made observation of some tracks leading from the front of the building across the sidewalk and down through the cement approach to the curb. There were a number of these tracks."

A fireman gave like testimony about the footprints. All of the State's witnesses who testified about the shoe tracks stated that they observed no footprints pointing to or leading toward the building from the curb. The sheriff made a drawing, Exhibit 5, of the heel prints in the snow. He stated:

"I had a conversation with the defendant the night after the fire. The defendant had on a Florsheim shoe and rubbers on the shoes. Exhibit 5, subject to imperfection of the lines, appears to be similar to the shoe he had on.

"I don't claim that Exhibit 5 is an exact simulation or reproduction of the heel print I saw in the snow."

The evidence relative to the footprints must be considered with the testimony of the State's star witness, Samuel Napolitina. This witness was an employee of defendant. He gave damaging testimony against the defendant.

Napolitina testified that defendant left the store about 11:30 on the morning of January 13th, stating that he was going to Minneapolis. His duties at the store did not require him to remain there after 6 p. m. He further testified:

"I went into the Neff store about midnight, turned on the radio and lay on the sofa. This was west of the front window. The radio was closer to the door than the davenport. One end of the davenport reached the west wall. Do not know how long I remained there. I turned on the radio and kind of dozed off and went to sleep. I woke up and I listened and

I heard the door open, someone had put a key in the door, and I woke up and shut the radio off and laid flat on the davenport. The door opened and I saw Claire Neff enter the store. He walked down the aisle towards the basement. There was an aisle there near the east wall in front of the door. The aisle was made of furniture. He walked north. He had a flashlight in his hand. There was no light in the store. There was a reflection from the streetlight over the back of the curtains. He walked to the back of the store, turned to the left and went downstairs. I unlocked the door and went out. I thought it was around a quarter to 3. I don't really know what time it was. I went home. I didn't speak to him when he came in. I was ashamed for him to know I was in the store. I had been in the store nights before and had told him about it. I didn't want to speak to him because I thought he had some business there and I didn't want to interfere with him. I didn't see him set out any fire.

"Q. Why did you get up and run out? A. Because I just did.

"Q. Well, I suppose that you, in order to cover your tracks, I suppose you walked right up close to the building so that you wouldn't walk in any snow, didn't you? A. I did.

"I heard about the fire about 7:30 the next morning and went down there. Saw Mr. Neff in the afternoon."

About a month after the fire, the witness made an affidavit that he was not at the store from the time he left the store at 6 p. m. on January 13th until about 7 o'clock the next morning.

"I was very certain that Mr. Neff did not set any fire and told the officers so, but they tried to make me say that he did and that I knew something about it. I am satisfied that Mr. Neff did not set any fire and did not have anything to do with the fire. I had nothing to do with the fire and as I stated, I never knew anything about it until about seven o'clock A. M. January 14th. It is the truth that I do not know how the fire started and it is the truth that I believe Mr. Neff had

nothing to do with the fire and had no knowledge of it until after it was all over."

There is also evidence of statements made by Napolitina that he was offered money to testify against Neff.

The theory of the State is that Neff drove his car in front of the Peterson building, went into the store through the front door, set fire to the building in the basement, returned to his car and drove to Rochester, Minnesota.

Without the testimony of Napolitina it is quite possible there would have been a different verdict. Credible evidence tending to impeach his testimony was introduced by defendant. The footprints leading from the building were 13¼ inches long. Defendant's shoes were not introduced in evidence. Exhibit 5 was not an accurate reproduction of the heel print in the snow and the testimony is that Exhibit 5 was similar to the heel of the shoe defendant wore the night after the fire. There were, in fact, no tracks in the snow leading to the front door of the store. The evidence offered by the State to prove that the tracks leading from the front door to the curb were made by defendant is none too convincing.

Instruction No. 13 tells the jury that the State had introduced evidence of footprints near the scene of the fire which the State claimed "to be pointing toward (and away from) the store building. The state claims that these footprints were made by the defendant."

It is error, of course, to assume or state in an instruction that certain facts exist which do not exist. The presumption is that the error is prejudicial and we, on this record, cannot hold that the error did not affect the result of the trial.

If there had been, as stated in the instruction, footprints in the snow leading to the door of the store, such fact would have supported the State's theory of the case and would have tended to corroborate and give credence to the testimony of Napolitina that he saw defendant enter the front door, walk to the back of the store and go downstairs to the basement.

The State urges in support of the instruction that where

the evidence of a defendant's guilt is conclusive and on the whole case it appears that the conviction cannot be reasonably supposed to have been the result of an erroneous instruction, the error will not constitute a ground for reversal, citing State v. Goode, 68 Iowa 593, 27 N. W. 772, and State v. Roberts, 222 Iowa 117, 268 N. W. 27. In the former case, erroneous language in the instruction was held not prejudicial where the undisputed direct evidence established that the defendant was guilty of the crime charged. In the Roberts case it was held that an instruction on the statutory presumption attending an attempt in the presence of peace officers to destroy intoxicating liquors, of which there was no supporting evidence, did not constitute reversible error because the undisputed facts in the record showed the possession of liquors by defendant was unlawful.

We cannot agree with the State that the circumstantial evidence conclusively established defendant's guilt and that the verdict could not have properly been a different one if the instruction had not been given. The instruction supplied a very important link in the chain of circumstances which, with other circumstantial evidence, and especially Napolitina's testimony, might have affected the verdict of the jury. It is not improbable that the instruction persuaded the jury that the witness Napolitina was telling the truth and did not tell the truth at the preliminary hearing.

Instruction No. 14 refers to oral or *written* admissions. Appellant urges that the written statement made by him on the night of January 14, 1938, did not contain facts or circumstances from which an inference of guilt might be drawn and therefore did not constitute a written admission. Though there may be merit to this assignment, because of our disposition of the case it is unnecessary for us to pass on this assignment and remaining assignments of error.—Reversed.

HAMILTON, C. J., and SAGER, MILLER, OLIVER, HALE, and MITCHELL, JJ., concur.

BLISS, J., takes no part.